IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JUDITH F. LESTER, | ) | CASE NO. 1:17-cv-01937 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Judith F. Lester ("Plaintiff" or "Lester") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying her applications for social security disability benefits.  Doc. 1.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties.  Doc. 12.  For the reasons explained herein, the

Court **AFFIRMS** the Commissioner's decision.

### I.  Procedural History

On April 16, 2015, Lester protectively filed[1] an application for disability insurance

benefits ("DIB") and, on August 26, 2016, she protectively filed an application for disabled

widow's benefits and an application for supplemental security income ("SSI").[2]  Tr. 11, 125,

138, 193-199, 208-215, 216-224.  In her applications, Lester alleged a disability onset date of

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 9/26/2018).

[2] Lester had filed a prior disability application, which resulted in an unfavorable ALJ decision, dated November 7, 2014.  Tr. 12, 88-118, 119-124.

November 27, 2014.  Tr. 11, 193, 208, 217.  She alleged disability due to anxiety/bipolar disorder, PTSD, ischemic heart disease, sciatica, right sided cerebral vascular accident, repeated sexual abuse, fatty liver, impulse control/intermittent explosive disorder, broken ankle requiring pins to fix, and confusion.  Tr. 125, 139, 159, 243.  After initial denial by the state agency (Tr. 158-161) and denial upon reconsideration (Tr. 166-168), Lester requested a hearing (Tr. 169-170).

On January 19, 2017, a hearing was held before Administrative Law Judge Amy Budney ("ALJ").  Tr. 39-87.  On June 1, 2017, the ALJ issued a decision denying Lester benefits (Tr. 8-38), finding that Lester had not been under a disability within the meaning of the Social Security Act from November 27, 2014, through the date of her decision (Tr. 13, 32).  Lester requested review by the Appeals Council of the June 1, 2017, decision.  Tr. 187-192.  On August 10, 2017, the Appeals Council denied Lester's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr.  1-6.

## II. Evidence

### A.    Personal, vocational and educational evidence

Lester was born in 1959.  Tr. 47, 193.  At the time of the hearing, Lester lived by herself in an apartment.  Tr. 47.  Her husband, Rodney Lester, passed away in August 2016.  Tr. 47, 820.  Lester completed four years of college – she was a communications major and a political science minor.  Tr. 48-49, 244.  Her past work included work as a cashier in retail stores.[3]  Tr. 49-53.  In disability reports, Lester relayed past mental, physical, and sexual abuse.  Tr. 244, 248.

---

[3] Lester was fired from one of her jobs after a background check revealed a prior felony.  Tr. 50, 244.  Lester had stabbed a boyfriend who had threatened her and she served three years in jail.  Tr. 248.

**B.      Medical evidence**[4]

**1.      Treatment history**

On March 16, 2013, a CT scan of Lester's brain was performed.[5]  Tr. 911-912.  There were no acute intracranial findings and the findings were consistent with mild left ethmoid sinusitis.  Tr. 912.

At the request of physician Perry M. Schall, M.D., on October 30, 2013, Lester saw Atanase Romeo Craciun, M.D., a neurologist at the Cleveland Clinic for an opinion regarding her history of poor sleep hygiene, obstructive sleep apnea syndrome, and restless leg syndrome.  Tr. 696-698.  Lester explained that she had been noticing problems with her sleep and being drowsy during the day.  Tr. 697.  She also relayed that she was under substantial psychological stress and had started to experience visual hallucinations.  Tr. 697.  She was feeling very uncomfortable and anxious at times and she was unable to perform her routine activities.  Tr. 697.  Dr. Craciun noted that Lester had a polysomnogram in August 2013, which showed obstructive sleep apnea syndrome, and a brain MRI in May 2013, which showed a remote ischemic stroke in the left frontal lobe.  Tr. 697.  Dr. Craciun noted other conditions, including Lester's history of bipolar disorder, PTSD, and alcoholism now in remission.  Tr. 697.  He indicated that no history of trauma to the head or seizure disorder was described.  Tr. 697.  Dr. Craciun recommended CPAP titration for Lester's obstructive sleep apnea; he ordered blood work regarding her restless leg syndrome; he ordered an ultrasound of the carotid and EEG in

---

[4] Lester indicated in her brief that she limited her medical evidence summary to evidence relating to her brain.  Doc. 15, p. 5, n. 2.  The Court's summary of the medical evidence is therefore generally limited in that manner as well.

[5] The reason for the CT brain scan is noted as "injury."  Tr. 911.  There are no specifics as to the type or extent of the injury.

light of some of the results of the polysomnogram; and he ordered glucose tolerance testing. Tr. 698.

Lester saw Dr. Craciun for follow up on December 3, 2013. Tr. 462-463. Lester had an EEG performed on November 12, 2013, which showed the presence of a sharp wave in the right temporal area with intermittent slow on the left temporal area. Tr. 462. Dr. Craciun found the results compatible with encephalopathy and the possibility of seizures. Tr. 462. Lester had been started on Keppra but she was not comfortable with it because it was making her drowsy and irritable. Tr. 462. Dr. Craciun continued Lester on Keppra. Tr. 463. Dr. Craciun noted that Lester was started on Lamictal. Tr. 462, 463. Other testing showed evidence of carotid arteriosclerosis obliterans minimal in the right but, in the left, it was between 50 and 70 which was a concern and he recommended a CAT scan angiogram to further evaluate the degree of stenosis. Tr. 462, 463. Dr. Craciun explained to Lester the importance of using the CPAP in light of the possibility of seizures and sleep deprivation secondary to obstructive sleep apnea. Tr. 462. On December 11, 2013, Lester underwent various scans, including a CT brain scan, which showed no acute hemorrhage or mass legion. Tr. 471, 489-490. The CT arteriogram showed no stenosis in the right internal carotid but 60 percent stenosis in the left internal carotid. Tr. 471, 490.

During an August 20, 2014, follow-up visit, Dr. Craciun noted that Lester was continuing to take Keppra and she was using Lamictal. Tr. 412. Lester had not had any seizure activity. Tr. 412. Lester also was continuing with the CPAP and reported no significant problems. Tr. 412.

On October 6, 2014, Lester saw Dr. Schall for follow up. Tr. 345-349. Lester was not sleeping well and had taken Nyquil for a few days. Tr. 345. Lester reported depression and

anxiety.  Tr. 346.  She was requesting Ativan or Klonopin.  Tr. 345.  Lester relayed that she was

planning on establishing a relationship with a new psychiatrist.  Tr. 349.  Dr. Schall continued

Lester on Ativan and Klonopin.  Tr. 349.  It was noted that Lester's seizures were stable.  Tr.

348.  When Lester followed up with Dr. Craciun on November 20, 2014, Lester remained on

Keppra and Lamictal and she reported no seizures.  Tr. 366.

Lester saw Dr. Schall on April 8, 2015.  Tr. 373-381.  Lester reported that she was

generally doing better.  Tr. 373.  She had started Prozac, which was prescribed by her new

psychiatrist, and she was seeing a psychologist regularly.  Tr. 373.  Lester's seizures were well

controlled with her medication.  Tr. 373.  Lester reported no frequent or significant headaches.

Tr. 373.

Lester saw Dr. Craciun for follow up on September 8, 2015.  Tr. 667-668.  Lester

reported no seizure activity and her only complaints were persistent headaches and some

evidence of recurrent numbness on the left side of her face.  Tr. 667.  Dr. Craciun noted that the

numbness was a matter of concern to Lester because a prior MRI of the brain showed white

matter signal changes and Lester wanted to make sure "nothing else took place."  Tr. 667.  There

was no history of falling episodes.  Tr. 667.  Dr. Craciun ordered a brain MRI.  Tr. 668.  He

recommended that Lester continue on Keppra and remain on the CPAP.  Tr. 668.

Lester's brain MRI was performed on September 28, 2015.  Tr. 672-674.  The MRI

showed no evidence of an acute intracranial process or significant change when compared to the

May 31, 2013, MRI; stable left orbitofrontal encephalomalacia most likely from remote trauma

versus small infarct; and stable nonspecific white matter changes and mild generalized

parenchymal volume loss.  Tr. 672.  Lester saw Dr. Craciun on December 7, 2015, for follow up.

Tr. 759-760.  Dr. Craciun explained that the September 28, 2015, brain MRI showed no

significant changes since the May 31, 2013, MRI.  Tr. 760.  Lester was interested in pursuing an ophthalmologic assessment regarding the residual changes.  Tr. 760.  Lester was not using her CPAP regularly.  Tr. 760.  Lester's seizures were stable but Lester's irregular use of the CPAP caused Dr. Craciun to express concern because of breakthrough seizures with sleep deprivation.  Tr. 760.  Lester indicated she would try to tolerate the CPAP.  Tr. 760.  Lester reported experiencing migrainous type headaches with clearly vascular characteristics.  Tr. 760.  The headaches were occurring rather often and Lester was interested in pursuing therapeutic options to address them.  Tr. 760.  Dr. Craciun started Lester on nadolol and he advised Lester to keep up with drinking electrolyte-containing beverages.  Tr. 760.  Dr. Craciun referred Lester for an ophthalmology consult due to intractable chronic cluster headaches.  Tr. 760, 761, 1045.

During a follow-up visit with Dr. Craciun on February 2, 2016, Dr. Craciun noted that Lester's use of nadolol and volume expanders was "rather successful."  Tr. 1051.  Lester saw Dr. Stephen McNutt who noted the presence of cataracts but provided no additional significant input.  Tr. 1051.  Lester relayed that she was using the CPAP on a regular basis.  Tr. 1051.  Dr. Craciun noted that it seemed that Lester was tolerating Keppra okay and it was protecting her from seizures.  Tr. 1051.  Lester was doing well with Klonopin and had had success in the past with Xanax.  Tr. 1051.  Dr. Craciun prescribed Xanax, ordered an ultrasound of Lester's carotids, and continued Lester on nadolol and Keppra.  Tr. 1052.  Lester had the ultrasound done on February 11, 2016.  Tr. 1058, 1061.

During an April 19, 2016, follow-up visit, Dr. Craciun explained that Lester's February 11, 2016, carotid ultrasound showed stenosis of greater than 70% or more on the left internal carotid artery.  Tr. 1061.  Lester was taking a baby aspirin daily.  Tr. 1061.  Dr. Craciun discussed with Lester ways of dealing with the risks associated with the carotid stenosis.  Tr.

1061.  Lester was using her CPAP regularly; she was taking Keppra; and she had not had any seizures.  Tr. 1061.  Dr. Craciun continued Lester on Keppra and recommended a CAT scan angiogram of the head and neck.  Tr. 1062.  Depending on the test results from the scans, Dr. Craciun noted that a vascular surgical consult might be warranted.  Tr. 1062.

On May 11, 2016, Lester was seen at the emergency room for high blood pressure.  Tr. 833.  During that visit, Lester was very upset about her husband's diagnosis of leukemia.  Tr. 833.  She relayed having chest pains, nausea, a headache behind both eyes, and tingling down both arms and legs.  Tr. 833.  She was found walking down the hallway asking for anxiety medication.  Tr. 833.  Lester was talked backed into her room and remained calm.  Tr. 833.  Lester indicated she had not taken any of her medications that morning.  Tr. 833.  Lester was much calmer after taking Klonopin.  Tr. 836-837.  She was discharged with instructions to follow up with her primary care physician regarding her blood pressure and the need for a stress test.  Tr. 836-837.

CT scans of the head and neck were performed on April 26, 2016.  Tr. 1068-1072.  The scans showed no acute intracranial process and stable 70 percent stenosis of the left internal carotid artery and mild stenosis of the right vertebral artery.  Tr. 1068, 1070.

On September 13, 2016, Lester met with her treating psychiatrist Sara Zuchowski, M.D., and relayed that her husband had passed away on August 11.  Tr. 804.  Lester lacked motivation and energy to do much and was grieving.  Tr. 804.  She was planning on going to the Gathering Place for bereavement.  Tr. 804.  Lester's diagnoses were major depressive disorder, recurrent episode, severe and PTSD.  Tr. 804.

Lester sought treatment at the emergency room on November 20, 2016, for anxiety.  Tr. 820.  She relayed that she lost her husband in August and was having a hard time dealing with

the loss. Tr. 820. Following a dose of Ativan, Lester was feeling better. Tr. 822. She was discharged with Ativan and advised to follow up with her primary care physician. Tr. 822.

### 2. Opinion evidence[6]

#### a. Consultative examiner

On February 9, 2017, consultative examining physician Dr. Khalid Darr met with Lester for an internal medicine examination. Tr. 1019-1032. Lester relayed that she had been having seizures for the past ten years. Tr. 1019. She indicated that she has a seizure every two weeks or so. Tr. 1022. She never really passes out but she gets dazed every month or so. Tr. 1019, 1022. The seizures last only a few minutes and then she is okay. Tr. 1019, 1022. Lester indicated that she had no problem with driving. Tr. 1022. In the "review of systems" section in the examination report, Dr. Darr noted that Lester had a "history of seizures which appeared to be not really any disabling seizures[.]" Tr. 1020. Dr. Darr diagnosed history of low back pain with no physical manifestations, history of restless leg syndrome, history of sleep apnea, history of seizures, and history of coronary artery diseases. Tr. 1022. In the summary portion of this examination report, Dr. Darr stated that Lester could lift and carry between 15 and 20 pounds frequently and over 15 pounds occasionally. Tr. 1022. He also stated that Lester's activities of daily living and instrumental activities of daily living seem to be intact. Tr. 1022.

In a separately completed Medical Source Statement of Ability to Do Work-Related Activities (Physical), Dr. Darr opined that Lester could frequently lift/carry 11 to 20 pounds and occasionally lift/carry 21 to 50 pounds. Tr. 1027. He opined that Lester could sit, stand or walk for 6 hours at one time without interruption and 6 hours total in an 8-hour workday. Tr. 1028.

---

[6] In her statement of facts, Lester includes summaries of the opinions from her treating psychologist Dr. Eugene Benedetto, Ph.D., treating psychiatrist Dr. Sara Zuchowski, M.D., and the psychological consultative examiner Dr. Katherine Alouani, Psy.D. Doc. 15, pp. 8-12. However, she does not rely on this opinions to support the arguments presented in this appeal. Accordingly, those opinions are not recounted herein.

With respect to use of hands and feet, Dr. Darr opined that Lester could frequently reach, handle, finger, feel, and push/pull with her hands and frequently operate foot controls with her feet.  Tr. 1029.  He also opined that Lester could frequently be exposed to environmental hazards.  Tr. 1031.

### b.   Reviewing psychologists

On August 12, 2015, state agency reviewing physician Gerald Klyop, M.D., adopted the physical RFC findings from the prior administrative law judge's November 17, 2014, decision. Tr. 134.  The November 17, 2014, physical RFC findings were as follows: ability to perform medium work except Lester could occasionally climb ramps and stairs but never climb ladders, ropes or scaffolds and must avoid concentrated exposure to humidity.  Tr. 97.

Upon reconsideration, on February 12, 2016, state agency reviewing physician Maureen Gallagher, D.O., M.P.H., adopted the physical RFC findings from the prior administrative law judge's November 17, 2014, decision.  Tr. 150.  In adopting the earlier RFC findings, Dr. Gallagher noted that Lester alleged headaches as of December 7, 2015, and that the headaches and facial numbness caused Lester to fall frequently.  Tr. 150.  However, she observed that medical records showed no changes in Lester's neurological examinations; a December 2015 brain MRI was unchanged and stable since May 31, 2013; other than a minimally broad-based gait, a December 2015 examination was otherwise normal.  Tr. 150.

### C.   Testimonial evidence

### 1.     Plaintiff's testimony

At the January 19, 2017, hearing, Lester provided testimony.  Tr. 47-70.  Prior to doing so, Lester indicated her desire to proceed without a representative.  Tr. 41-42.  She also executed a "waiver of representation by the claimant" on that same date.  Tr. 185.

When asked why she was unable to work, Lester indicated she falls down and has balance problems, she has memory and concentration problems, and things are just hard for her due to having been abused in the past. Tr. 53. For at least a year, Lester indicated that her legs had been giving out on her. Tr. 54. She fell when coming to the hearing and relayed a past instance when she fell down a 40 foot embankment in a park when going over a guardrail. Tr. 53-54. She could not get up because her legs would not support her. Tr. 54. A man found her and provided her with assistance. Tr. 54. Her memory problems had been going on for a while as well. Tr. 54. For example, she visits her mother at least once a week and had recently forgotten the code to her mother's garage. Tr. 54-55. Lester uses a pill box to help manage her medications. Tr. 56. With respect to her concentration problems, she explained that she used to love to read but now she has a hard time staying focused and she is easily distracted. Tr. 56-57.

Lester has taken and takes medication for various conditions, including blood pressure, seizures, problems sleeping, cholesterol, an ulcer, and mental health issues. Tr. 57-60. One of Lester's doctors had prescribed Lunesta for her to help her with her sleep but it caused her to do very weird things. Tr. 58, 59. For example, she would walk around at night and her husband told her she was running into a door like a bull banging her head into the door. Tr. 58. Another time, her husband told her she woke up and got scissors and starting cutting up a quilt. Tr. 58. Lester was not sure whether she was having a seizure when she was banging her head into the door because, when she has one, she just comes out of it and "all of a sudden [she is] there." Tr. 58. Once she stopped taking the Lunesta, the unusual activities stopped and she was sleeping, although at times it is hard for her to fall asleep. Tr. 58-59.

Lester had not had a seizure in a little while. Tr. 60. She explained that sometimes months will go by without a seizure and other times she will have one a couple times each

month.  Tr. 60.   Depending on what is going on in her life, Lester has a real high heartbeat.  Tr. 61.  Lester has headaches a couple of times each week that are so bad that she feels them behind her eyes.  Tr. 62.  When she has a headache, she has to take an aspirin and lie down.  Tr. 62.  She was unable to estimate how long her headaches last.  Tr. 62.  Lester has a blocked artery in her neck.  Tr. 62.  She is not sure whether the blocked artery is the cause of her headaches.  Tr. 62.  Lester's neck also bother here because she can hear her neck bones crunching when she turns her neck.  Tr. 62-63.  She thinks the sound she hears is the result of all the times she has fallen on or been hit in her head.  Tr. 63.

Lester had two heart attacks.  Tr. 64.  Lester was aware of only one of the two, the one which occurred about four years prior to the hearing and required a stent.  Tr. 64.  Lester's doctor had informed her that testing had showed an earlier heart attack.  Tr. 64.  Lester has breathing problems and breaks out into a sweat if she is doing any type of physical exertion.  Tr. 65.

Lester relayed that, since her husband's death, she had been nervous and breaking out in hives.  Tr. 63.  Also, she was stressed about her financial situation.  Tr. 63.

Lester sees Dr. Bennedetto and Dr. Zukowski for her mental health issues.  Tr. 60.  She sees Dr. Bennedetto for counseling and Dr. Zukowski for medication management.  Tr. 60.  She sees Dr. Craciun in neurology and was working on finding a new family doctor and a new heart doctor.  Tr. 45-46, 60-61.

Lester has a driver's license and has not had issues when she drives.  Tr. 48.  She noted that she has been informed that she has seizures but she has never had one while driving.  Tr. 48.  Lester's sleep varies.  Tr. 61.  Sometimes she does not fall asleep until 3:00 a.m.  Tr. 61.  Lester takes a nap during the day that lasts a couple of hours.  Tr. 61-62.   Lester smokes but has been

trying to cut back.  Tr. 64.  She no longer drinks alcohol and does not use drugs that are not prescribed.  Tr. 64-65.

Although difficult, Lester can walk as far as she might have to.  Tr. 65-66.  She does not have any issues with sitting.  Tr. 66.  She estimated being able to lift around 10 or 20 pounds.  Tr. 66.

Lester has problems interacting with people.  Tr. 66.  She described one time when she lost her temper and became very irate with a pharmacist who was not willing to fill a prescription because she did not think certain drugs should be taken together.  Tr. 66-67.  When Lester was working, she had problems interacting with others, including customers and coworkers.  Tr. 67-68.  She tried to stay away from coworkers that she did not like.  Tr. 68.  There are a few women in Lester's apartment building that she gets along with.  Tr. 68.

Since her husband's death, Lester had been depressed.  Tr. 67.  Lester noted that she was grateful for having such a good daughter.  Tr. 67, 69.  Lester attended some group sessions at the Gathering Place to help her with the loss of her husband.  Tr. 68-69.

Towards the end of Lester's testimony, the ALJ asked Lester what had changed since the last time she appeared before an administrative law judge.  Tr. 69.  Lester relayed that she was doing worse.  Tr. 69-70.  She was coping with the loss of her husband; she was having the headaches and the crunching in her neck; and she was no longer watching much television because everything she watched seemed to upset her.  Tr. 70.  Seeing stories about victims of abuse were hard for Lester.  Tr. 70.

### 2. Samantha Theresa Story

Lester's daughter Samantha Theresa Story ("Story") testified at the hearing.  Tr. 70-77.  Story sees her mother weekly and talks with her daily.  Tr. 71.  Story indicated that, since

Lester's husband had passed away, Lester's memory problems had gotten worse. Tr. 71. The things that her mother was forgetting were generally minor but frequent. Tr. 71. Story has also observed that her mother gets off track. Tr. 73-74. Story discussed some of Lester's physical impairments and discussed her interpersonal problems, noting that she felt that her mother does not have a filter and has a hard time ignoring people or things that upset her. Tr. 72-73, 75. Since 2014, Story felt that her mother was doing better in some areas and worse in other others. Tr. 76.

### 3. Vocational Expert

Vocational Expert ("VE") Brett Salkin testified at the hearing. Tr. 77-86. The VE described Lester's past cashier/sales clerk work as an SVP 3, light exertional job.[7] Tr. 78.

The ALJ then asked the VE a series of hypothetical questions. Tr. 78-86. In response to a hypothetical containing the limitations set forth in the RFC ultimately assessed by the ALJ (Tr. 20-21, 78, 80), the VE indicated that there would be jobs available for the individual described therein, including dishwasher, cleaner, and janitor.[8] Tr. 79, 80.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

---

[7] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 WL 1898704, *3 (Dec. 4, 2000). "Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT." *Id.*

[8] The VE provided national job incidence data for the identified jobs. Tr. 79, 80.

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[9] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[10] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

---

[9] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

[10] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

20 C.F.R. §§ 404.1520, 416.920;[11] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In her June 1, 2017, decision, the ALJ concluded that there was new and material

evidence showing additional limitations since the prior administrative law judge issued his

findings on November 7, 2014. Tr. 12. Thus, consistent with *Drummond v. Comm'r of Soc.*

*Sec.*, 126 F.3d 837 (6th Cir. 1997),[12] the ALJ did not adopt the prior RFC.[13] Tr. 12. The ALJ

made the following findings:[14]

1. Lester meets the insured status requirements of the Social Security Act through December 31, 2016. Tr. 15.

2. It was previously found that Lester is the unmarried widow of the deceased insured worker and has attained the age of 50. Tr. 15. Lester met the non-disability requirements for disabled widow's benefits set forth in section 202(e) of the Social Security Act. Tr. 15.

---

[11] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[12] The Sixth Circuit recently explained that:

The key principles protected by *Drummond*—consistency between proceedings and finality with respect to resolved applications—apply to individuals *and* the government. At the same time, they do not prevent the agency from giving a fresh look to a new application containing new evidence or satisfying a new regulatory threshold that covers a new period of alleged disability while being mindful of past rulings and the record in prior proceedings.

*Early v. Comm'r of Soc. Sec.*, 893 F.3d 929, 931 (6th Cir. 2018) (emphasis in original).

[13] Plaintiff does not raise an issue regarding the ALJ's application of *Drummond*.

[14] The ALJ's findings are summarized.

3.     The prescribed period ends on October 31, 2019.  Tr. 15.

4.     Lester has not engaged in substantial gainful activity since November 27, 2014, the alleged onset date.  Tr. 15.

5.     Lester has the following severe impairments: carotid artery disease without cerebral infarction, coronary artery disease, remote infarct right sided cerebral vascular accident, history of encephalopathy, history of mild peripheral neuropathy,  history of mild cervical degenerative disc disease, ischemic heart disease, hypertension, myocardial infarction, hyperlipidemia, chronic liver disease, trimalleolar left ankle left ankle fracture status post open reduction and internal fixation, substance abuse disorder in remission, bipolar, impulse control disorder, post-traumatic stress disorder (PTSD), major depressive disorder, and anxiety disorder. Tr. 15.  Lester has the following non-severe impairments: obstructive sleep apnea, Hepatitis B, seizures, nuclear scelotic cataract, lipoma, history of restless leg syndrome, chronic obstructive pulmonary disease, gastro esophageal reflux disease, history of acute kidney injury, and obesity.  Tr. 15-16.  The following were not medically determinable impairments: insomnia, urinary tract infection, infected wound, laceration of the finger, and confusion.  Tr. 16.

6.     Lester does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Tr. 16-20.

7.     Lester had the RFC to perform medium work as defined in 20 C.F.R. § 404.1567(c) except that she can occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds.  Lester must avoid concentrated exposure to humidity.  Mentally, Lester can understand and remember one-to-three step instructions and can complete one-to-three step tasks.  Lester would work best in small groups or alone and can sustain tasks as long as these involve only superficial interaction with others.  Lester can adapt to infrequent (occasional) changes in a static work setting.  Lester cannot be required to work with the general public.  Starting July 15, 2016, Lester can perform simple, routine, and repetitive tasks but not at a production rate pace (e.g., assembly line work).  Lester can occasionally tolerate changes that should be well explained and introduced slowly.  Lester can frequently interact with supervisors and occasionally interact with coworkers but should not work in tandem.  Tr. 20-30.

8.     Lester is unable to perform any past relevant work.  Tr. 30.

9.     Lester was born in 1959 and was 54 years old, which is defined as an individual closely approaching advanced age, on the alleged disability

onset date. Tr. 31. Lester subsequently changed age category to advanced age. Tr. 31.

10. Lester has at least a high school education and is able to communicate in English. Tr. 31.

11. Transferability of job skills is not material to the determination of disability. Tr. 31.

12. Considering Lester's age, education, work experience, and RFC, there are jobs that existed in significant numbers in the national economy that Lester could perform, including dishwasher, cleaner, and janitor. Tr. 31-32.

Based on the foregoing, the ALJ determined Lester had not been under a disability, as defined in the Social Security Act, from November 27, 2014, through the date of the decision. Tr. 32.

## V. Plaintiff's Arguments

First, Lester argues that that ALJ erred at Step Three by not considering whether Lester's seizure disorder met or medically equaled Listing 11.02 (Epilepsy). Doc. 15, pp. 14-16. Second, Lester argues that the ALJ's RFC is not supported by substantial evidence because the ALJ did not account for Lester's headaches. Doc. 15, pp. 16-19.

## VI. Law & Analysis

## A. Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## B.     Reversal and remand is not warranted based on the ALJ's Step Three finding

Lester argues that the ALJ did not address Listing 11.02 and remand is warranted because the record raises a substantial question as to whether Lester's seizure disorder meets or medically equals Listing 11.02 (Epilepsy).

At Step Three of the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii). The claimant bears the burden of establishing that her condition meets or equals a Listing. *Johnson v. Colvin*, 2014 U.S. Dist. LEXIS 50941, *7 (W.D. Ky. Apr. 14, 2014) (citing 20 C.F.R. §§ 404.1520(d), 416.920(d); *Buress v. Sec'y of Health and Human Serv's.*, 835 F.2d 139, 140 (6th Cir. 1987)). A claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. SSA*, 93 Fed. Appx. 725, 728 (6th Cir. 2004). "If . . . the record 'raises a substantial question as to whether the

claimant could qualify as disabled' under a listing, the ALJ should discuss that listing." *Sheeks v. Comm'r of Soc. Sec. Adm.*, 544 Fed. Appx. 639, 642 (6th Cir. Nov. 20, 2013) (citing *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)).

Lester argues that "she met her burden by providing objective medical evidence that raises a 'substantial question' as to her seizure disorder meeting or equaling 11.02D." Doc. 15, p. 15.

Listing 11.02D requires a showing of the following:

11.02 Epilepsy, documented by a detailed description of a typical seizure and characterized by . . .

D. Dyscognitive seizures (see 11.00H1b)[15], occurring at least once every 2 weeks for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following:

1. Physical functioning (see 11.00G3a); or
2. Understanding, remembering, or applying information (see 11.00G3b(i)); or
3. Interacting with others (see 11.00G3b(ii));
4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
5. Adapting or managing oneself (see 11.00G3b(iv)).

20 C.F.R. pt. 404, subpt. P, App. 1, pt. A2, § 11.02D.

Lester argues that the following evidence raises a "substantial question" that she meets or equals 11.02D such that the ALJ erred by not discussing the listing. First, she points to Dr. Craciun's diagnosis on November 12, 2013, of seizure disorder. Doc. 15, p. 15. Second, she points to the fact that she was started on and continued to take medication to treat her seizure disorder. Doc. 15, pp. 15-16. Third, she points to her statement to Dr. Darr during her consultative examination that she experienced a seizure once every two weeks. Doc. 15, p. 16.

---

[15] Dyscognitive seizures are characterized by alteration of consciousness without convulsions or loss of muscle control. During the seizure, blank staring, change of facial expression, and automatisms (such as lip smacking, chewing or swallowing, or repetitive simple actions, such as gestures or verbal utterances) may occur. During its course, a dyscognitive seizure may progress into a generalized tonic-clonic seizure (see 11.00H1a). 20 C.F.R. pt. 404, subpt. P, App. 1, pt. A2, § 11.02H1b.

Fourth, she contends that her description of her seizures may satisfy 11.02D1, i.e., that her seizures caused a marked limitation in her physical functioning. Doc. 15, p. 16.

As Lester acknowledges, to satisfy Listing 11.02D, there must be evidence of seizures occurring at least every two weeks despite prescribed medication. Further, Listing 11.02D requires that the seizures occur at least once every two weeks <u>for at least three consecutive months</u>. The evidence relied upon by Lester does not raise a substantial question that her condition satisfies 11.02D. Although Lester relayed to Dr. Darr that she has a "seizure every two weeks or so" (Tr. 1022), as Lester noted in her brief, at the hearing, she testified that the frequency of her seizures can be irregular (Doc. 15, p. 16, n. 6, Tr. 60). More particularly, at the hearing, Lester indicated that months can go by without a seizure occurring and other times it seems like she has a seizure a couple times a month and she had not had a seizure "in a little while anyway." Tr. 60. Also, treatment records reflect that Lester's seizure condition was under control. *See e.g.*, Tr. 366 (11/20/2014, Dr. Craciun visit ("No seizure has been described and she is quite comfortable with that.")); Tr. 373 (4/8/2015, Dr. Schall visit ("seizures-well control[l]ed on the present med's")); Tr. 667 (9/8/2015, Dr. Craciun visit ("Reports no seizure[] activity[]")); Tr. 760 (12/7/2015, Dr. Craciun visit ("History of seizure disorder, stable")); Tr. 1061 (4/19/2015, Dr. Craciun visit (Lester "has been taking Keppra and did not have any seizures.")). Considering the foregoing, Lester has not shown that a "substantial question" was raised as to whether her condition satisfied Listing 11.02D of seizures. Lester's own testimony and treatment records refute her argument that the frequency requirement in 11.02D, i.e., seizures occurring at least once every two weeks for at least three consecutive months, is or can be satisfied. Lester contends that error at Step Three is also demonstrated by the fact that she was not represented by counsel and, therefore, the ALJ had a special duty to ensure a full and fair

hearing.  Doc. 15, p. 16.  Lester's argument is conclusory and she has failed to identify a failure by the ALJ to ensure a full and fair hearing.

For the reasons discussed herein, the Court finds that the ALJ did not err by not discussing Listing 11.02D and the Court finds that reversal and remand is not warranted based on the ALJ's Step Three finding.

**C.     Reversal and remand is not warranted for further evaluation of the RFC**

Lester argues that the ALJ's RFC is not supported by substantial evidence because the ALJ did not account for Lester's headaches.  Doc. 15, pp. 16-19.

The Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record.  20 C.F.R. §§ 404.1545(a)(3), 404.1546(c).   The ALJ, not a physician, is responsible for assessing a claimant's RFC.  *See* 20 C.F.R. § 404.1546(c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. 2009) ("[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding.").

Lester points out that the ALJ did not find her headaches to be either a severe or nonsevere impairment.  Doc. 15, p. 18.  Although the ALJ did not find Lester's headaches to be a severe or nonsevere impairment, the ALJ considered Lester's allegation that her alleged disability was due, in part, to headaches.  Tr. 21 ("The claimant subsequently alleged that she experienced headaches . . .  The claimant testified that she [was] unable to work due to . . . headaches from blocked arteries and blood pressure . . .").  In concluding that Lester's subjective allegations were not entirely consistent with evidence of record, the ALJ considered the record as a whole, including objective testing, generally unremarkable examinations, and activities of daily

living,  Tr. 21-23, 25.  For example, the ALJ considered the September 28, 2015, brain MRI that Lester points to when arguing that the ALJ did not take into account her headache allegations (Doc. 15, p. 18).  Tr. 22, 672, 968.  The ALJ also considered the opinions of state agency reviewing physicians, including the opinion of Dr. Gallagher[16] who considered Lester's subsequent allegations of headaches.  Tr. 25, 150.  Considering Lester's allegations of headaches and the medical evidence, Dr. Gallagher found no additional limitations beyond those found in the prior RFC, i.e., medium work except can occasionally climb ramps and stairs but never climb ladders, ropes or scaffolds and must avoid concentrated exposure to humidity.  Tr. 150.  The ALJ provided great weight to Dr. Gallagher's opinion (Tr. 25) and included RFC restrictions consistent with those found by Dr. Gallagher (Tr. 20).

The foregoing demonstrates that the ALJ did not ignore allegations or evidence regarding Lester's headaches.  Further, Lester does not point to medical opinion evidence identifying functional limitations caused by her headaches.   Nor does she indicate what further limitations should have been included in the RFC.  Rather than identifying specific restrictions that the ALJ should have included in the RFC to account for limitations caused by her headaches, Lester argues that "the ALJ's decision does not mention how chronic headaches <u>might</u> affect her ability to function."  Doc. 15, p. 19 (emphasis supplied).

---

[16] As set forth at Tr. 25, Dr. Gallagher was the state agency reviewing physician upon reconsideration.

For the reasons discussed herein, the Court finds that Lester has failed to demonstrate error by the ALJ or that the RFC is not supported by substantial evidence.  Accordingly, reversal and remand is not warranted.

### VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.


Dated: September 26, 2018                          _/s/ Kathleen B. Burke_____
                                                                    Kathleen B. Burke
                                                                    United States Magistrate Judge